**Laura GILLESPIE et vir., Appellants,**

v.

**Sandra Beth MATNEY, Appellee.**

**No. 12060.**

Court of Civil Appeals of Texas, Austin.

July 18, 1973.

Dick M. Allison, Byrd, Davis, Eisenberg & Clark, Austin, for appellants.

E. Barham Bratton, Barry K. Bishop, Clark, Thomas, Denius, Winters & Shapiro, Austin, for appellee.

SHANNON, Justice.

Appellants, Laura Gillespie, and husband, Hal K. Gillespie, sued appellee, Sandra Beth Matney, in the district court of Travis County for physical pain and mental anguish suffered by Mrs. Gillespie from a miscarriage alleged to have been caused by an automobile collision. Based upon a jury verdict, judgment was entered that appellants recover nothing. We will affirm that judgment.

Appellants' major contention is that the jury's negative answer to the damage issue inquiring as to Mrs. Gillespie's physical pain and mental anguish was so against the overwhelming weight and preponderance of the evidence so as to be clearly wrong. Appellee's position below, and here, is that Mrs. Gillespie's miscarriage was not caused by the automobile collision.

Appellants' suit arose from a daytime collision in Austin at the "T" intersection, of Duval and Bellevue Streets, on October 2, 1971. In general, Duval runs north and south, and Bellevue runs east and west. A stop sign controls movement of traffic from Bellevue onto Duval. Before the collision Mrs. Gillespie was driving her Datsun north on Duval at 25 or 30 miles per hour and appellee had stopped her Oldsmobile in response to the stop sign. Appellee waited for several cars to pass, and then slowly pulled away from the stop sign onto Duval. At that time Mrs. Gillespie was nearly to the intersection. When she saw appellee pulling into Duval she applied her brakes, but was unable to stop.

At the time of impact the appellee's automobile was still moving forward very slowly. The Oldsmobile struck the right door and front fender of the Datsun. Photographs introduced into evidence show the right door of the Datsun to be moderately dented and its right front fender to be scraped. Appellee's automobile was not damaged save for a small dent near an insignia on the upper part of the grille.

At the time of the collision Mrs. Gillespie was thrown forward into her abdominal seatbelt, but she was able, in effect, to brace herself by holding to the steering wheel with both hands. She testified that she suffered no muscular injuries, no bruises, no cuts, no strains or sprains in the collision. Shortly after the accident both Mrs. Gillespie and appellee told the investigating officer that they were not hurt. Mrs. Gillespie was able to drive her automobile away from the place of the collision. Though Mrs. Gillespie suffered no apparent physical injury in the collision, she was "real shaken" and "very, very nervous."

On the date of the collision, Mrs. Gillespie was about four months pregnant, and was under the care of Dr. Joseph Quander, an obstetrician-gynecologist. About six weeks before the collision, she had experienced "spotting" caused by a polyp on the edge of her uterus. She testified that Dr. Quander removed the polyp by a surgical procedure in his office, but that the spotting had continued until about two weeks before the collision.

The collision happened on a Saturday and for the rest of that day and the next Mrs. Gillespie was nervous and upset. On Sunday evening she began bleeding, but had no cramps. She saw Dr. Quander Monday morning. She continued to bleed on Monday and during that night, and on Tuesday morning she experienced severe cramping and miscarried at her home.

Mrs. Gillespie suffered no subsequent difficulties from the miscarriage, and at the time of trial was experiencing a normal pregnancy.

Dr. Quander testified in person and by deposition. He testified that in his opinion "the combination of the physical and emotional trauma resulting from the automobile accident" probably precipitated Mrs. Gillespie's miscarriage.

In an effort to test the knowledge of Dr. Quander and determine the weight of his testimony, appellee's counsel questioned him from certain medical treatises concerning the question of whether or not trauma or shock lead to miscarriage, and the question of how long after fetal death a miscarriage occurs.

Dr. Quander was asked if he agreed with the following statement taken from one of the medical textbooks:

"Everyone, doctor and layman alike, seeks a tangible simply understood cause for the more commonplace medical phenomena: a woman aborts. Why? It must have been related to some immediate joy, sorrow or fright, or perhaps to a recent fall, bump or blow. The woman, the husband and the doctor all forget the multiple traumas which have not interrupted the pregnancy previously. They only remember the particular one which appeared to have a time relationship to the abortion.

An important argument against the role of trauma in causing spontaneous abortion is the fact that most spontaneous abortions occur six weeks, or so, after fetal death, and if trauma were the cause, it would not be a recent incident, but one which happened some six weeks before the abortion occurred, as a rule.

That the traumatic factor may be overemphasized is borne out by Hergib and · Shelton's analysis of one thousand cases of abortion, and only one of which they were definitely able to ascribe the cause to external trauma and psychic shock."

Dr. Quander answered by stating that he did not agree with "all of it" (the statement from the textbook). Appellee's counsel then asked Dr. Quander what parts of

the statement he disagreed with, and his reply was,

"The basic thesis that they are trying to develop. According to the edition I read, it wasn't that dogmatic, so to speak. They weighed this thing, and it specifically seemed one would have to take the individual case, the factors involved, look at the time sequence and then come up with a medical opinion, but I just couldn't say I agree with everything that was said there.

That edition is—well, it is just old. It is obsolete, and the new developments in obstetrics and fetology are so recent that one would just have to have a current copy of the book, as well as even some of the more recent studies that had just not even gotten to the literature yet."

After this response, the following exchange occurred between appellee's counsel and the doctor.

"Q  Have you ever read the book, Obstetrics and Gynecology, by Willson, Beechman, and Carrington?  It is a 1963.

A  No, no.  Insofar as the medical textbooks, the medical textbooks that come out of the most recent textbook takes about two or three years to re-edit, and Eastman is probably the best book, because it is re-edited every two or three years.  I mean, it comes out.

But even then, one would have to go to the most recent copy of Eastman, and even supplement that with the current monthly literature to come up with just medical assertion, and people disagree. . Some of the experts disagree on matters of this—

Q  A lot of experts disagree on this particular area, do they not, Doctor?

A  Well, in all areas in obstetrics.  It depends upon the school you come from, and it depends on sort of your philosophy and attitudes about things."

Dr. Quander's response to the statements read from the medical textbook was less than forthright.  Though he said that he did not agree with "all of it", he was vague in explaining those portions of the statement to which he agreed and those to which he did not.  The jury could well have concluded from his responses to cross-examination that there was disagreement between the medical authorities as to the role of trauma in miscarriages and as to how long after fetal death a miscarriage occurs.  In this connection the jury could have considered the fact that inasmuch as the miscarriage occurred at appellant's home, Dr. Quander had no opportunity to examine the fetus to ascertain the date of its death.

Aside from the cross-examination of Dr. Quander, the jury could have weighed the fact that the collision was a relatively minor one and that Mrs. Gillespie sustained no apparent physical injuries in the collision.  From an examination of the record we are of the opinion that the jury could have concluded justifiably that appellants failed to show by a preponderance of the evidence that the collision was the cause of the miscarriage, and are of the opinion that the verdict was not so against the great weight and preponderance of the evidence as to be manisestly unjust.  See In Re King's Estate, 150 Tex. 662, 244 S.W. 2d 660 (1951).

In view of our disposition of this part of appellants' appeal, their other points concerning the answers of the jury to the liability issues need not be considered.

Affirmed.